UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

PATRICIA A. BREESE,

               Plaintiff,

      v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

               Defendant.

Case No. 6:14-cv-00333-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Patricia A. Breese ("Breese"), seeks judicial review of the final decision by

the Social Security Commissioner ("Commissioner") denying her applications for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC

§§ 401–433, and Supplemental Security Income ("SSI") under Title XVI of the SSA, 42

USC §§ 1381–1383f.  This court has jurisdiction to review the Commissioner's decision

pursuant to 42 USC § 405(g) and § 1383(c)(3).  All parties have consented to allow a

Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP

73 and 28 USC § 636(c).  For the reasons set forth below, that decision is REVERSED and

REMANDED for an award of benefits.

## ADMINISTRATIVE HISTORY

Breese protectively filed for DIB and SSI on August 25, 2009, alleging a disability onset date of January 1, 2009.  Tr. 69, 71, 174–209.[1]  Her applications were denied initially and on reconsideration.  Tr. 70, 72-74, 78–91.  On April 23, 2012, a hearing was held before Administrative Law Judge ("ALJ") Rudolph Murgo.  Tr. 32–67.  The ALJ issued a decision on May 10, 2012, finding Breese not disabled.  Tr. 9–24.  The Appeals Council denied a request for review on January 22, 2014.  Tr. 1–6.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.  20 CFR §§ 404.981, 416.1481, 422.210.

## BACKGROUND

Born in 1967, Breese was 44 years old at the time of the hearing.  Tr. 35.  She earned a GED and Certified Nurse Assistant ("CNA") certification (Tr. 37, 247) and has past relevant work experience as a CNA.  Tr. 231.  Breese alleges that she is unable to work due to the combined impairments of grade 2 spondylolisthesis on L5-S1, degenerative disc disease, bilateral carpal tunnel syndrome, anxiety attacks, shortness of breath, a pinched nerve in her leg, and back problems.  Tr. 17, 182.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).  The ALJ engages in a five-step sequential

---

[1]  Citations are to the page(s) indicated in the official transcript of the record filed on July 11, 2014 (docket #13).

inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 CFR §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098–99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If so, the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR §§ 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the

claimant can perform other work in the national economy. 20 CFR §§ 404.1520(a)(4)(v) &

(g), 416.920(a)(4)(v) & (g); *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at

1099.

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180

F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show

that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner

meets this burden, then the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(v) & (g),

416.920(a)(4)(v) & (g), 416.960(c).

## ALJ'S FINDINGS

The ALJ found that Breese met the insured status requirements of the SSA through

June 30, 2014. Tr. 14. To obtain DIB, Breese must prove that her disability existed on or

before her date last insured ("DLI"). *See Tidwell v. Apfel*, 161 F3d 599, 601 (9th Cir 1998).

At step one, the ALJ concluded that Breese has not engaged in substantial gainful

activity since January 1, 2009, the alleged onset date. *Id*.

At step two, the ALJ determined that Breese has the severe impairments of asthma,

degenerative disc disease of the lumbar spine, obesity, marijuana use, affective disorder,

and anxiety disorder. *Id.*

At step three, the ALJ concluded that Breese does not have an impairment or

combination of impairments that meets or equals any of the listed impairments. Tr. 15. The

ALJ found that Breese has the RFC to perform light work, except she can "only

occasionally climb ropes and ladders, stoop, and crouch," "requires the option to sit or

stand," and "is limited to simple, routine tasks with occasional public contact." Tr. 16.

Based upon the testimony of a vocational expert ("VE"), the ALJ determined at step four that Breese's RFC precluded her from returning to her past relevant work.  Tr. 23.

At step five, considering Breese's age, education, and RFC, the ALJ found that she was capable of performing the jobs of a small products assembler, food preparation worker, and packager and sorter.  Tr. 24.

Accordingly, the ALJ determined that Breese was not disabled at any time through the date of the decision.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007).  Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'"  *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).

///

///

///

## FACTUAL AND MEDICAL BACKGROUND

On November 7, 2008, Breese first complained of back pain radiating to her knees which JoDee Rundall, P.A., diagnosed as lumbar back pain. Tr. 362, 492. X-rays taken that same day showed lumbar pain radiating down the right leg and grade 2 spondylolytic anterolisthesis at L5-S1 with prominent disk space narrowing and probable bilateral foraminal narrowing. Tr. 317–18.

On July 14, 2009, Breese again reported lumbar pain to physician assistant ("PA") Rundall, radiating down her right leg and causing her entire leg to go numb. Tr. 356. The back pain began after a bike accident when Breese was young. *Id.* PA Rundall noted that her pain followed an L4 distribution and diagnosed grade 2 spondylolytic anterolisthesis of L5-S1 with prominent disc space narrowing and probable bilateral foraminal narrowing, and prescribed a Prednisone taper. Tr. 356–57.

The following week, Gary Goby, M.D., diagnosed Breese with anxiety after she experienced increased anxiousness associated with the Prednisone taper. Tr. 354.

On July 30, 2009, an MRI showed "[b]ilateral pars defects at L5 allowing anterolisthesis of L5 on S1 . . . causing severe bilateral foraminal narrowing with compression of the exiting L5 nerve roots." Tr. 313. Based on these results, Dr. Goby referred Breese for a neurosurgical consultation. Tr. 342–45.

On August 24, 2009, neurosurgeon Michael Malos, M.D., diagnosed Breese with grade 2 spondylolisthesis of L5 on S1 and recommended surgery to decompress the foramen at L5-S1 or a conservative approach of physical therapy, considerable weight loss, and aquatic exercise. Tr. 292. Dr. Malos opined that surgery would "stand a good chance of helping her with her radicular symptoms, but, unfortunately, she may not get resolution of her back pain." *Id.*

On September 9, 2009, Breese returned to Dr. Goby who noted that Breese could not stand for more than two or three minutes or walk for more than a block and a half before she developed spinal claudication symptoms, and referred her to Oregon Health Sciences University ("OHSU") for further treatment.  Tr. 339–41.

On September 24, 2009, Breese complained of tingling in her right hand and arm which at times caused numbness in both arms.  Tr. 336.  Dr. Goby noted positive Tinel signs over the median nerve on the right side and diagnosed carpal tunnel syndrome.  Tr. 337–38.  Dr. Goby completed a Department of Human Services form indicating that Breese was unable to participate in job search or employment, work experience, or vocational rehabilitation program classes.  Tr. 480–82.  He indicated that Breese had recurrent disability with sudden back pain and may need to limit her standing.  Tr. 482.

During September and October 2009, Breese was treated at Linn County Mental Health Services for anxiety attacks, accompanied by "heart pounding, difficulty breathing, sweating, fear of dying, and fear of going crazy" that she reported having three to four times a week for 10 minutes.  Tr. 298–305.  Laura Smith, M.A., diagnosed Panic Disorder without Agoraphobia, Posttraumatic Stress Disorder, and Adjustment Disorder with Depressed Mood, concluding that Breese's symptoms related directly to her physical injuries that had stopped her from working. Tr. 300–01, 305.

On October 28, 2009, OHSU neurologist Kenneth C. Liu, M.D., examined Breese and recommended surgery as the "best chance for helping her leg pain" even though he was "not sure it will help her with her back pain."  Tr. 436–37.

On February 9, 2010, Allen G. Brooks, M.D., examined Breese and noted no tenderness in the lumbar spine, but noted sciatic notch tenderness causing radiation of pain down the right

leg and limited range of motion due to pain in her back.  Tr. 380.  Due to a mild Tinel's test over both median nerves in her wrists, Dr. Brooks diagnosed "[p]robable bilateral carpel tunnel syndrome."  *Id.*

On February 17, 2010, psychiatrist Gale Smolen, M.D., examined Breese.  Tr. 382–85.  Dr. Smolen noted that Breese appeared to be in a lot of pain because "[s]he got up on two occasions" and "had to keep adjusting her position every few seconds and appeared very uncomfortable."  Tr. 384–85.  Dr. Smolen opined that Breese is able to "remember and understand with mild to moderate impairment," is able to concentrate as long as she does not have a lot of pain, and "is not able to get along well with people on a mental basis."  *Id.*  She diagnosed mood disorder due to back pain and panic disorder without agoraphobia.  Tr. 385.

On February 19, 2010, Dr. Liu surgically fused Breese's spine at L5-S1.  Tr. 294–95, 408–09.  Through February 23, 2010, Breese participated in physical and occupational therapy and made "significant functional gains in her mobility, pain control, and diet."  Tr. 409.

On March 18, 2010, reviewing psychologist, Dorothy Anderson, Ph.D., completed a Mental RFC Assessment form.  Tr. 452–54.  Dr. Anderson opined that Breese "is able to understand and remember simple tasks and routines," but is "easily overwhelmed and stressed, and loses her ability to persist and concentrate because of her chronic pain" which "will limit her from persisting on . . . tasks . . . performed in close concert with coworkers in a reliable fashion."  *Id*.  Although Breese does not require "special supervision," she "will not work reliably with the public, or in close cooperation/coordination with coworkers," needs "help in making meaningful work goals" and "is not good at assessing her capability and gives up easily."  *Id.*

After surgery on March 20, 2010, Breese reported to PA Rundall that she had pain running down her left leg and tingling in the bottom of her right foot.  Tr. 581.  Although she

continued to experience sharp, stabbing pain in the left side of her back two to three times a day, her symptoms had improved by 65%. *Id.*

On March 23, 2010, reviewing physician, Linda L. Jensen, M.D., completed a Physical RFC Assessment form checking boxes that Breese could lift and carry 20 pounds occasionally and ten pounds frequently; stand and walk for at least two hours, and sit for six hours; could occasionally climb ladders, ropes, scaffolds, stoop, and crouch; and could frequently climb ramps and stairs, balance, kneel, and crawl. Tr. 461–68.

By March 24, 2010, Breese reported to PA Rundall that the pain in her left leg was improving. Tr. 575. However, the low back pain persisted, had spread from the right side to both sides and was made worse with bending over or lifting. *Id.* On April 28, 2010, Breese still reported chronic pain in her low back that "flares up when she bends over or stands too long or is too active," although her back pain had improved 70% since the surgery. Tr. 566. PA Randall prescribed an increase in Amitriptyline until her back pain got 80–90% better. Tr. 568.

On June 23 2010, Breese reported to PA Rundall that the Amitriptyline was not helping her back pain and that walking three blocks caused increasing pain in her right thigh and right trochanteric bursa sac (fluid-filled sac near the hip joint). Tr. 541. Breese was scheduled to resume physical therapy the next week. *Id.*

On July 14, 2010, Breese reported that her heels "feel like they are [on] fire" and her legs "ache a lot." Tr. 538. Breese "love[d]" the TENS unit at physical therapy, but did not feel it always helped her pain. *Id.* That same day, PA Rundall completed a Physical RFC Report stating that Breese could lift or carry only five pounds; stand or walk for less than one hour; sit for only one hour; had limited ability to push and pull in the upper and lower extremities; could never climb, balance, bend, or kneel; but could occasionally reach, handle, finger, and feel.

Tr. 479–80.  PA Rundall also stated that she expected Breese's condition to last one to three years and that her prognosis was fair.  Tr. 481.

On July 27, 2010, Breese showed no improvement with pain in the upper and lower back, despite taking Percocet, and her feet and hands "always feel[] hot" with "pins/needles."  Tr. 535.

On August 16, 2010, Craig D. McNabb, M.D., examined Breese at PA Rundall's referral. Tr. 484–86.  Breese told him that her position of comfort is "lying down but not for any length of time."  Tr. 484.  He observed decreased lumbar range of motion, some back pain with straight-leg raise bilaterally and "50 degrees of straight-leg bilaterally in a lying position."  Tr. 485. Although Breese's pain control was "better than preoperatively," it "continued to be a significant issue."  *Id.*  Dr. McNabb opined that Breese "probably also does have some longstanding nerve irritation, particularly at the L5 nerve root which may not have fully resolved with this surgery and this can cause persistent discomfort," and predicted it would take six months to one year to return to her previous level of function.  *Id.*  He prescribed a "low back stretching exercise program" and physical therapy, but doubted Breese's insurance would cover physical therapy. *Id.*

On December 14, 2010, Breese complained of chronic low back pain with right radiculopathy although she felt 70% better since surgery.  Tr. 497, 500.

On February 21, 2011, Cecilia Keller, M.D., examined Breese at PA Rundall's request. Tr. 629–33.  She concluded that Breese "had some improvement but she has not returned to a good functional base" and "has developed new symptoms of paresthesias involving her feet," but displayed no weakness.  Tr. 632.  Dr. Keller ordered an MRI of Breese's lumbar spine that showed "persistent grade I anterior spondylolisthesis."  Tr. 635–36.

In April and May 2011, Breese reported she was losing weight and exercising more. Tr. 661–66. She was walking regularly, had lost six pounds, was working in the barn, and climbing more stairs. Tr. 661, 664. But her back pain had increased because of the exercise, and she experienced pain, numbness, and tingling 50% of the day. Tr. 661.

On August 4, 2011, Breese saw Patrick Rusk, M.D., a pain and spine specialist, who provided pharmacological treatment through February 28, 2012. Tr. 812, 821. On August 17, 2011, Breese was still walking for exercise. Tr. 857. In January 2012, Dr. Rusk observed that Breese walked with a "slightly hunched forward gait," was unable to walk on her toes, "exhibiting some weakness distally," and had positive Spurling's signs in both lower extremities. Tr. 813–14. He diagnosed postlaminectomy syndrome and ordered another MRI[2] due to continued back pain radiating to both of her lower extremities and "new possible weakness to the right lower extremity and incontinence and some vulvar anesthesia." Id. Despite being a candidate for a spinal cord stimulator, Breese opted to stay with her pain medication and "hold the [simulator] as a last resort." Tr. 813.

On April 17, 2012, Breese reported that she fell a couple of times while walking long distances after she lost sensation in her feet and was unable to feel the ground. Tr. 832. PA Rundall prescribed a wheeled walker for long distance walking. Tr. 835.

## DISCUSSION

Breese asserts that the ALJ erred by: (1) rejecting her subjective symptom testimony; (2) failing to credit the residual functioning assessment of PA Rundall and full opinion of Drs. Smolen and Anderson; and (3) failing to characterize her carpal tunnel syndrome as severe at step two.

---

[2] As of March 16, 2012, the MRI had not been performed due to difficulty obtaining insurance coverage. Tr. 813, 839.

I.    **Credibility Determination**

Breese argues that the ALJ failed to give clear and convincing reasons for finding her subjective complaints "not fully credible." Tr. 21.

A.    **Breese's Testimony**

At the time of the hearing, Breese had been using a walker prescribed by PA Rundall for six months because her legs and feet would become numb, causing her to fall. Tr. 43, 56. When not using the walker, she had fallen four times in the preceding four months. Tr. 56. With the walker, she can walk four to six blocks. Tr. 44. She can sit for 30 minutes before needing to change positions to relieve the pain. *Id*. She lies down for about 30 minutes three times a day due to both pain and her medications which make her tired and dizzy. Tr. 59. She can stand for five minutes before her feet feel "tingly and on fire." Tr. 60. Walking is better than standing. *Id*. She can also lift a gallon of milk. Tr. 44.

Her usual daily routine is to awaken her younger daughter for school around 6:00 am. Tr. 45. Her daughter dresses herself and is served breakfast at school. *Id*. Her older daughter usually walks her younger daughter and grandson to the bus stop, but Breese will accompany them if she is not having a "bad morning." Tr. 46. For the rest of the day, she sits on the couch, watches TV, lies down, or plays a computer game, but not for very long. Tr. 47. Some days she meets the children at the bus stop. Tr. 49. She previously walked longer distances, but has cut back because of the numbness in her feet. Tr. 58. Breese sits with her daughter as she completes her homework and usually falls asleep at 8:00 pm. Tr. 50.

Because she does not drive, either her older daughter shops for groceries or her sister-in-law drives her to the grocery store once or twice a month. Tr. 47–48. Breese does

not do laundry, rarely does housekeeping, does not often cook because she cannot stand long enough, and does the dishes only if there are a couple of items.  Tr. 48–49.

Breese left her job as a full-time, in-home caregiver in 2009 because of numbness in her legs and feet (more on her right side) and lower back pain.  Tr. 53–54.  Her back fusion surgery in 2010 improved her symptoms, so she was able to stand longer.  Tr. 54–55.  Even after the surgery, Breese experiences back spasms "[a]ll the time," persistent low back pain radiating into her right leg, and numbness in her feet.  Tr. 55.  She has anxiety attacks about three to four times a week, each lasting 30 minutes, but Xanax helps her symptoms.  Tr. 57.

### B.    Legal Standards

The Ninth Circuit has developed a two-step process for evaluating the credibility of a claimant's own testimony about the severity and limiting effect of the claimant's symptoms. *Vasquez v. Astrue*, 572 F3d 586, 591 (9th Cir 2009).  First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter*, 504 F3d at 1036.  Second, "if the claimant meets the first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Id*, quoting *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996).  The ALJ's overall credibility determination may be upheld even if not all of the ALJ's reasons for rejecting the claimant's testimony are supported by substantial evidence.  *Batson*, 359 F3d at 1197.

### C.    Analysis

With no evidence of malingering, the ALJ was required to provide clear and convincing reasons for rejecting Breese's testimony.  The ALJ rejected her testimony

because:  (1) her subjective complaints were inconsistent with her daily activities; (2) work she performed after her alleged onset date "evidences a higher level of functioning than alleged;" (3) she did not "fully" comply with her medical treatment; and (4) her marijuana use "shows a pattern of voluntary injurious behavior."  Tr. 20–21.  None of these reasons is clear and convincing.

The ALJ first rejected Breese's testimony because she has the "ability to walk, stand, complete tasks, exercise, and socialize on a regular basis," suggesting "greater functioning than alleged."  Tr. 21.  The ALJ overstates Breese's abilities and daily activities.

Stating that Breese "shops in stores for groceries," the ALJ cites Breese's report on September 21, 2010 to Dr. Goby.[3]  Tr. 21, citing Tr. 698.  However, that report does not support the ALJ's statement because it actually states that "if [Breese] exerts herself, just even a little bit such as goin[g] to the grocery store, she will pay for it later."  Tr. 698.  The ALJ also describes Breese's typical day as "preparing her children for school, preparing meals, and cleaning her home," citing a nurse practitioner's note dated August 4, 2011.  Tr. 20, citing 822.  However, Breese does very little in those areas.  She testified that her daughter dresses herself and is served breakfast at school.  Tr. 45.  Sometimes Breese walks her daughter to the bus stop, but normally her older daughter accompanies the children.  Tr. 46.  This testimony, as well as Breese's testimony that she does not do laundry, rarely does housekeeping, does not cook often, and does the dishes only if there are a couple of items (Tr. 48–49) is consistent with her report to Dr. Smolen on February 17, 2010, that she "does none of the housework anymore because of her back pain.  She sits and gives directions."  Tr. 383.

---

[3] The ALJ relied on Breese's reports to her medical providers because she did not return a written statement about her activities and functional abilities.  Tr. 466.

As evidence of Breese's activities, the ALJ primarily cites medical records from 2010 and 2011 when Breese experienced a brief period of improved symptoms after her back fusion surgery.  Tr. 21.  She reported on November 16, 2010, that she exercised in the water four to seven times per week (Tr. 518, 521, 683, 685); on April 15, 2011, that she was taking regular walks with her sister-in-law (Tr. 664, 857); and on May 31, 2011, that she lost three pounds in the past month from working in the barn and climbing more stairs. Tr. 661.  The increase in exercise was prescribed by her doctors for weight loss and back pain.  Tr. 513, 749, 858.  It is error for an ALJ to rely on completion of prescribed exercise to conclude that the claimant exaggerated her symptoms.  *Reddick*, 157 F3d at 722–23 & n1. Furthermore, this surge in activity is consistent with her April 23, 2012 hearing testimony that a year and a half earlier she walked longer distances and lost weight, but her pain and numbness returned, causing her to cut back on her physical activities.  Tr. 58.

The ALJ also references Breese's regular church attendance, as well as watching television, playing a computer game, and reading magazines.  Tr. 21.  However, those sedentary activities hardly indicate that Breese is more functional than she alleges.  The Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability." *Orn v. Astrue*, 495 F3d 625, 639 (9th Cir 2007) (citation and internal quotation marks omitted) (finding error the ALJ's rejection of the claimant's testimony because of evidence she could read, watch TV, and color in a coloring book).  Furthermore, the ALJ fails to provide evidence that Breese does any of these activities on a regular basis.  To the contrary, except for her regular church attendance and awakening her daughter for school, she "does nothing on a regular basis."  Tr. 383.  None of these activities satisfy the grounds for an adverse credibility

determination because they neither contradict her other testimony nor exhibit transferable work skills.

Second, the ALJ cites Breese's employment after her alleged onset date as evidence that she can perform medium exertion employment. Tr. 21. Breese earned less than $3,000.00 in 2009 as a full-time, in-home caregiver and $163.00 in 2010 working only two hours a day. Tr. 52–53, 225–26. The Commissioner argues this work shows she can lift 50 pounds and 25 pounds frequently, as is required for medium work, and contradicts her own testimony that she can lift a gallon of milk (Tr. 44) and only stand for five minutes before needing to move or lie down. Tr. 60. In fact, her testimony is consistent with her allegation that she cannot meet the physical demands of in-home nursing care. She told the ALJ that she quit her part-time work because her leg would go numb and could not stand long enough to give care, lift patients, or do housework. Tr. 52–53.

Breese's unsuccessful attempt to complete even part-time work does not support the conclusion that she has transferable work skills. The regulations encourage a trial work period when claimants can attempt to work without losing their disability status. *See* 20 CFR § 404.1592(a). She explained that she returned to work part-time because she was trying to "[b]elieve [she] could still do [her] job." Tr. 52. Upon doing so, she discovered she could not meet the demands of light work, and certainly not medium work.

Third, the ALJ finds Breese's testimony less than credible because of her non-compliance with prescribed treatment, citing instances in which Breese gave her sister Oxycodone in exchange for Percocet and her failure to lose weight as recommended. Tr. 21.

On August 17, 2011, PA Rundall became concerned that Breese was selling her prescribed Oxycodone pills after she tested negative for the drug. Tr. 856. Despite Breese's explanation that she tried tolerating the pain without the aid of medication, PA Rundall required a urine test which was negative (Tr. 832) and terminated the prescription. Tr. 856–58. PA Rundall then informed the pain specialist, Dr. Rask, who "had a long discussion with [Breese] about this" on March 22, 2012. Tr. 824. Breese "indicate[d] very strongly that she does not sell the oxycodone," but admitted that she occasionally "changes an oxycodone pill for her sister's Percocet pill." *Id.* Dr. Rask ultimately concluded that Breese was consistent with her pain management based on her consistent, positive urine tests at the pain clinic (including March 22, 2012) and at PA Rundall's office. *Id.* He informed PA Rundall of his conclusion and told Breese that "she should never give anyone her medications or take anybody else's medication." *Id.* There is no indication that providers had concerns about Breese's compliance with her pain medication after March 22, 2012. Thus, this isolated event is not a clear and convincing reason to discredit Breese.

The Commissioner does not defend the ALJ's reliance on Breese's failure to lose weight. Perhaps this is because the Ninth Circuit has found that a claimant's failure to lose weight as recommended by her doctor is not determinative of her credibility. *See Orn*, 495 F3d at 638 ("the failure to follow treatment for obesity tells us little or nothing about a claimant's credibility").

Fourth, the ALJ improperly relied on Breese's marijuana use as showing "a pattern of voluntary injurious behavior." Tr. 21. There is no evidence that Breese has a history of drug abuse. She reported using marijuana without a prescription to relieve her back pain. Tr. 535, 698. On November 16, 2010, she obtained a medical marijuana prescription,

suggesting that the marijuana was an effective treatment in alleviating, not aggravating, her condition. Tr. 683. She told PA Rundall that she felt it improved her pain 25%. Tr. 535. She testified that she ingested marijuana cookies, but stopped because she did not like them, consistent with her negative drug screens from 2011 and 2012. Tr. 42, 51, 828, 844, 859–60. There is no record that Breese used marijuana after her medical marijuana card lapsed in December 2011. Tr. 37.

The Commissioner makes several arguments in support of the ALJ's credibility determination that were not given by the ALJ, such as Breese's inconsistent statements about her marijuana use and medical evidence conflicting with Breese's alleged need for a walker. The court cannot consider reasons not cited by the ALJ in making his credibility determination. "Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ — not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F3d 1219, 1225 (9th Cir 2009) (citation omitted).

By not providing clear and convincing reasons to reject Breese's testimony, the ALJ erred.

## II.  Opinions of Drs. Smolen and Anderson

The ALJ assigned "great weight" to examining psychiatrist Dr. Smolen's February 2010 opinion that Breese "could remember and understand with mild to moderate impairment, . . . [c]ould concentrate as long as she does not have a lot of pain" and "could not get along well with people on a mental basis." Tr. 22, citing Tr. 385. The ALJ relied on this opinion to limit Breese to "simple, routine tasks with only occasional public contact." *Id*. The ALJ also gave "great

weight" to the March 2010 RFC assessment by reviewing psychologist Dr. Anderson . Tr. 21, citing Tr. 452–54.

Breese argues that the ALJ erred in failing to limit her interaction with supervisors or coworkers based on Drs. Smolen and Anderson's assessments. The Commissioner contends that the restriction to occasional public contact (Tr. 16) sufficiently incorporates Drs. Smolen and Anderson's opinions and, if not, any failure to do so was harmless error. Breese contends that the omission of Breese's limitations in interacting with coworkers and supervisors is not harmless because all jobs require the ability to respond appropriately to supervision and coworkers. *See* SSR 85-15, 1985 WL 56857, at *4 ("The basic mental demands of competitive, remunerative, unskilled work include the abilit[y] (on a sustained basis) . . . to respond appropriately to supervision, [and] coworkers.").

Despite Dr. Anderson's assessment that Breese "will not work reliably with the public, or in close cooperation/coordination with coworkers," she also stated that Breese does not require "special supervision;" was "not significantly limited" in her "ability to sustain an ordinary routine without special supervision," "to work in coordination with or proximity to others without being distracted by them," "to ask simple questions or question assistance," and "to accept instructions and respond appropriately to criticism from supervisors;" and was only moderately limited in her ability to "get along with coworkers or peers without distracting them or exhibiting behavioral extremes." Tr. 452–53. These latter statements fully support the ALJ's conclusion not to limit Breese's interaction with coworkers or supervisors.

Moreover, consistent with assessments by the other mental health providers (Tr. 305, 385), Dr. Anderson opined that Breese's recent mental limitations stemmed from her chronic, physical pain. Tr. 454. It is therefore reasonable to conclude that pain reduction, if achievable,

would diminish Breese's mental limitations in the workplace. Breese's physical restrictions remain her primary barrier to employment.

An ALJ's assessment of a claimant adequately captures restrictions when the assessment is consistent with restrictions identified in the medical testimony. *Stubbs-Danielson v. Astrue*, 539 F3d 1169, 1174 (9th Cir 2008), citing *Howard v. Massanari,* 255 F3d 577, 582 (8th Cir 2001). Because the ALJ's RFC is supported by Dr. Anderson's assessments that Breese does not require special supervision and is not significantly limited in her ability to interact with coworkers and supervisors, the ALJ did not err in incorporating these opinions into the RFC.

## III.    <u>Opinion of PA Rundall</u>

The ALJ assigned "limited weight" to PA Rundall's July 2010 assessment. A PA is not an "acceptable medical source," but is considered a medical source included under the category of "other sources," 20 CFR 404.1513(d)(1) & 416.913(d), which the ALJ may disregard if he "gives reasons germane to each witness for doing so." *Turner v. Comm'r of Soc. Sec.*, 613 F3d 1217, 1224 (9th Cir 2010), quoting *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001).

As his reasons to reject PA Rundall's opinion, the ALJ cited its: (1) inconsistency with the record; (2) lack of explanation other than a diagnosis to support her limitations; and (3) failure "to link symptoms of this condition with specific functional limitations" as reducing "the persuasiveness and usefulness of her opinion in assessing accurate functional limitations." Tr. 22. These reasons are not germane.

First, the ALJ found PA Rundall's assessment inconsistent with the "well-reasoned opinion of Dr. Jensen, who is an acceptable medical source." *Id*. Only opinions from an "acceptable medical source" can establish the existence of a medically determinable impairment,

provide medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight. SSR 06-03P, 2006 WL 2329939, at *2 (2006). However, the Commissioner may use evidence from "other sources" to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." *Id*. The same factors used to evaluate medical opinions from "acceptable medical sources" can be applied to opinion evidence from "other sources," including: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with the other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (3) how well the source explains the opinion; and (4) whether the source has a specialty or area of expertise related to the individual's impairments. *Id* at *4.

The ALJ gave "some weight" to Dr. Jensen's assessment dated March 23, 2010, including her notation that Breese no longer had falls or experienced difficulty walking after the fusion surgery. Tr. 21–22, citing Tr. 461-68. Although Dr. Jensen is an acceptable medical source, his opinion may be outweighed by the opinion of PA Rundall in some circumstances.

> For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

SR 06-03P, 2006 WL 2329939, at *5.

As in that example, PA Rundall saw Breese more often than Dr. Jensen and had better supporting evidence. She treated Breese from April 2007 (Tr. 332) through April 2012 (Tr. 832) and had been treating Breese for about two years at the time of the 2010 assessment. Tr. 362. Her treatment history from 2008 to 2010 catalogues Breese's persistent efforts to obtain relief for her radiculopathy, numbness, and pain.

On the other hand, Dr. Jensen assessed Breese's limitations without an examination and without giving weight to the opinions of specialists, such as Dr. Brooks. Tr. 467. Moreover, Dr. Jensen's opinion was given only one month after Breese's fusion surgery when she was still experiencing pain relief and increased mobility due to the operation. Tr. 468. The last medical report considered by Dr. Jensen was the March 17, 2010 follow-up examination after her February 19, 2010 surgery, at which Breese reported that she no longer fell or had difficulty walking. *Id.* Dr. Jensen does not reference Breese's complaints to PA Rundall in March and April 2010 of consistent back pain. Tr. 566, 575, 581. Even though Breese reported a 65-70% improvement of her symptoms following surgery (Tr. 500, 581), she continued to experience symptoms of radiculopathy including pain, numbness, and decreased mobility.

The ALJ also erred by rejecting PA Rundall's assessment for only citing diagnoses and failing to connect the symptoms with specific functional limitations. First, the ALJ failed to recognize that the PA Rundall's opinions were supported by two years of records, including objective testing (Tr. 317) and significant experience treating Breese. *See Garrison v. Colvin*, 759 F3d 995, 1013 (9th Cir 2014) (finding error with the ALJ's rejection of a neurologist's check-box answers in a questionnaire, which the ALJ found unsupported and unexplained). Second, PA Rundall explained the supporting medical evidence for her conclusions in a December 28, 2010 letter. Tr. 492–93. Third, PA Rundall referred Breese to several specialists who validated Breese's continued pain complaints and PA Rundall's assessed limitations. Tr. 292 (Dr. Malos), 380 (Dr. Brooks), 436 (Dr. Liu), 485 (Dr. McNabb). In February 2010, Dr. Kelly diagnosed probable bilateral carpal tunnel syndrome, later confirmed by nerve conduction studies. Tr. 380, 867-85. In August 2010, Dr. McNabb opined that although Breese's pain control was "better than preoperatively," it "continued to be a significant issue" due to probable

L5 nerve root irritation.  Tr. 485.  On June 24, 2010, Bonnie Schlegelmann, P.T. evaluated

Breese at PA Rundall's request.  She observed that Breese was standing "with decreased weight

bearing" in the right leg, increased fold at the left waist, and still presenting "quite a bit of pain

and loss of function."  Tr. 489.  Fourth, Dr. Goby, who treated Breese during the same period

starting in January 2009 (Tr. 321) made similar medical findings as PA Rundall.  He diagnosed

carpal tunnel (Tr. 337–38), referred her to OHSU for a spine consultation (Tr. 339–41), and

opined that Breese had "recurrent disability with sudden back pain."  Tr. 482.

Thus, the ALJ erred by rejecting PA Rundall's RFC assessment in favor of Dr. Jensen's

opinion.

## IV.    Step Two Determination

Breese argues the ALJ erred by failing to discuss her carpal tunnel syndrome at step two.

"An impairment or combination of impairments may be found 'not severe *only if* the evidence

establishes a slight abnormality that has no more than a minimal effect on an individual's ability

to work.'"  *Webb v. Barnhart*, 433 F3d 683, 686 (9th Cir 2005), quoting *Smolen*, 80 F3d at

1290.  Although the claimant bears the burden of establishing a medically determinable

impairment, *see Bowen*, 482 US at 146, the inquiry at step two "is a *de minimis* screening

device to dispose of groundless claims."  *Smolen*, 80 F3d at 1290 (citation omitted).  Thus,

the reviewing court must "determine whether the ALJ had substantial evidence to find that the

medical evidence clearly established that [the claimant] did not have a medically severe

impairment or combination of impairments."  *Webb*, 433 F3d at 687 (citation omitted).

The evidence before the ALJ relating to Breese's alleged carpal tunnel syndrome meets

the *de minimis* standard of severity at step two.  On November 24, 2009, Dr. Goby noted a

positive Tinel sign over the right, medial nerve, and diagnosed Breese with carpal tunnel

syndrome. Tr. 337–38. In February 2010, neurologist Dr. Brooks noted that Breese has a mild Tinel's response over both median nerves at the wrist (but a negative Phalen's response), as well as some decreased sensation to light touch in the index fingers bilaterally. Tr. 380. He diagnosed "probable carpal tunnel syndrome," the extent of which "would have to be determined based on nerve conduction studies." *Id*. Those studies were not done until a week before the April 2012 hearing. Tr. 867–85. At the hearing, Breese's attorney informed the ALJ of those studies, but had difficulty obtaining them through a records release and requested the ALJ hold the record open to include those test results. Tr. 66. The ALJ declined. *Id.* However, Breese submitted the nerve conduction study results to the Appeals Council. Tr. 4. Those results showed "severe bilateral carpal tunnel syndrome" (Tr. 869), resulting in a recommendation by the examining PA on April 26, 2012, for a "surgical release." Tr. 831.

When the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, as it did here, that evidence becomes part of the administrative record, which this court must consider when reviewing the Commissioner's final decision for substantial evidence. *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F3d 1157, 1162 (9th Cir 2012). These records confirm that Breese has limitations related to the use of her hands related to carpal tunnel.

Thus, substantial evidence in the medical record establishes that Breese's carpal tunnel syndrome was a severe impairment. It is not clear from the current record to what extent her carpal tunnel would restrict her ability to perform sedentary work as defined in 20 CFR 404.1567(a). Therefore, the error was not harmless.

///

V.    __Remand__

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138 (9th Cir 2011). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id.*

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id*, quoting *Benecke v. Barnhart*, 379 F3d 587, 590 (9th Cir 2004). The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003). The reviewing court declines to credit testimony when "an outstanding issue" remains. *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

As discussed above, the ALJ erred by failing to credit Breese's testimony and the limitations assessed by PA Rundall, as well as failing to include her carpal tunnel syndrome as a severe impairment. With PA Rundall's assessment credited, Breese cannot perform

light work.  Whether the carpal tunnel syndrome would preclude her from performing

sedentary work is not clear.  However, with Breese's testimony fully credited, she requires

non-scheduled breaks to lie down during the work day for pain relief.  According to the VE,

this requirement alone precludes her from competitive employment.  Tr. 65.  Thus, no

outstanding issues remain to be decided, and this case is reversed and remanded for an

immediate award of benefits.

DATED April 1, 2015.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge